

# THE ATTORNEY GENERAL
## OF TEXAS

April 20, 1987

**JIM MATTOX**
**ATTORNEY GENERAL**

Honorable Jack Skeen, Jr.
Criminal District Attorney
Smith County Courthouse
Tyler, Texas    75702

Opinion No.  JM-681

Re:  Determination of emergency service fee for a 9-1-1 communication district under article 1432e, V.T.C.S.

Dear Mr. Skeen:

You seek our opinion concerning the determination of the 9-1-1 emergency service fee for an emergency communication district created pursuant to article 1432e, V.T.C.S.  The district was approved by the voters of Smith County in 1986.  You ask three questions:

> 1.  If the principal service supplier charges different base rates for the same category of service in different participating jurisdictions within the district, then which base rate is determinative for the purpose of applying the emergency service fee uniformly within all participating jurisdictions within the district?

> 2.  If the principal service supplier charges different base rates for single party and multi-party residential service, then which base rate is determinative for the purpose of applying the emergency service fee uniformly within all participating jurisdictions within the district?

> 3.  Does article 1432e require that each service user within a participating jurisdiction be provided with 9-1-1 emergency service regardless of the cost or other impracticality of providing such service to the particular service user (assuming that the emergency service fee is not charged to the particular service user until such service is actually available)?

Article 1432e was enacted for the purposes of establishing the number 9-1-1 as the primary emergency telephone number for certain local government units and encouraging these units of government to

develop and improve emergency communication procedures and facilities. V.T.C.S. art. 1432e, §2. It authorizes the creation of an emergency communication district to carry out the provisions of the act. Id. §5. Voter approval must be secured at a confirmation and fee election before the district may exercise its public and essential governmental functions. Id. §§11, 12.

Section 11 of the act describes the procedures for creating the district. The board of managers of an emergency communication district is required to call an election for the purposes of securing voter approval of the creation of the district and to authorize the district to charge and collect a 9-1-1 emergency service fee. Id. §11(c). The section also provides the method by which the emergency service fee is calculated:

> The board may charge a 9-1-1 emergency service fee <u>at a rate not to exceed three percent of the base rate of the principal service supplier per service year per month in the participating jurisdictions</u>. The jurisdiction of a county is the unincorporated area of the county. <u>The 9-1-1 emergency service fee must have uniform application and must be imposed within all participating jurisdictions</u>. (Emphasis added).

Id. §11(b). The underscored phrase "per service year" will be discussed later in this opinion. The final sentence of section 11(b) is the source of your first two inquiries.

The first question concerns a situation in which the telephone company which is designated the principal service supplier to the district charges different base rates to residential customers in different participating jurisdictions in the district who receive the same level of service. The second question concerns a situation in which the principal service supplier charges different base rates to single-party and multiple-party residential customers within the district. Both may be treated together.

Your first two questions essentially ask the same question -- specifically, whether the 9-1-1 emergency service fee is intended to be (1) a fixed dollar amount to be charged to all residential telephone customers in the district regardless of the base rate they are charged, or (2) a uniform percentage rate applied to the various base rates charged by the principal service supplier to residential telephone customers. We believe the second alternative accurately reflects the intent of the legislature.

In our opinion, the language of section 11(b) requiring uniform application of the emergency service fee throughout the district means

that the percentage rate adopted by the board of managers must be
uniformly applied to whatever base rate is charged to the service user
by the principal service supplier.  Article 1432e does not require a
uniform base rate for all residential subscribers to telephone service
within the district.  Rather, it requires the emergency service fee to
have uniform application.  The only component of the emergency service
fee over which the board is expressly granted the authority to fix is
the percentage rate upon which the fee is calculated.  It follows that
the object of the language in section 11(b) is this percentage rate.

It is apparent from the language of article 1432e that the
legislature anticipated the possibility that different base rates
would be charged to subscribers in different jurisdictions of the
district for the same level of service.  The act defines "base rate"
in the following terms:

> 'Base rate' means the rate or rates billed by a
> service supplier, as stated in the service
> supplier's charges approved by the appropriate
> regulatory authority, that represent the service
> supplier's recurring charges for local exchange
> access lines/trunks or their equivalent, exclusive
> of all taxes, fees, license costs, or similar
> charges.  (Emphasis added).

V.T.C.S. art. 1432e, §3(21).  This definition acknowledges that the
authority to regulate base rates is granted to agencies other than the
emergency communication district.  It also recognizes that the
appropriate regulatory authority may approve a number of different
rates for local exchange access lines or trunks within the district.

Our construction of section 11(b) is supported by the legislative
histories of article 1432e and two virtually identical statutes,
articles 1432c and 1432d, V.T.C.S.  See Jessen Associates v. Bullock,
531 S.W.2d 593 (Tex. 1975) (in construing statutes, it is proper to
look to construction given other acts pertaining to the same subject).

Article 1432c, V.T.C.S., was enacted in 1983 and authorizes the
creation of a 9-1-1 communication district in counties having a
population of more than 2 million according to the most recent federal
census.  See Acts 1983, 68th Leg., ch. 97, at 465; V.T.C.S. art.
1432c, §4(a).  Section 10(b) of article 1432c grants the board of
managers of the district the authority to impose a fee for 9-1-1
emergency service:

> The board, when so authorized by a majority of the
> votes cast in the election and by a majority vote
> of the governing body of each public agency to
> become a participating jurisdiction, may charge a

> 9-1-1 emergency service fee <u>at a rate not to exceed</u>
> <u>two percent of the base rate of the principal</u>
> <u>service supplier per service user per month</u> in the
> participating jurisdictions.  For the purposes of
> this vote of the governing body of each public
> agency, the jurisdiction of the county includes all
> unincorporated areas of the county.  <u>The 9-1-1</u>
> <u>emergency service fee must have uniform application</u>
> <u>and must be imposed within all participating juris-</u>
> <u>dictions.</u>  (Emphasis added).

Article 1432d, V.T.C.S., was enacted during the second called session of the 68th Legislature in 1984 and authorizes the creation of an emergency communication district in counties with a population of more than 860,000 according to the last federal census.  Acts 1984, 68th Leg., 2nd C.S., ch. 7, at 22; V.T.C.S. art. 1432d, §4.  On its enactment, section 11(b) of that act contained the following language:

> The board may charge a 9-1-1 emergency service fee
> at a rate not to exceed three percent of the base
> rate of the principal service supplier <u>per service</u>
> <u>year</u> per month in the participating jurisdictions.
> The 9-1-1 emergency service fee must have uniform
> application and must be imposed within all par-
> ticipating jurisdictions.  (Emphasis added).

The underscored phrase "per service year" was corrected in 1985 to read "per service <u>user</u>."  Acts 1985, 69th Leg., ch. 820, §6, at 2878 (effective June 15, 1985).  Before the erroneous language was corrected by the legislature, however, the bill which contained article 1432e was passed by both houses of the legislature and signed by the governor containing the same defect.  Acts 1985, 69th Leg., ch. 288, at 1331 (effective June 6, 1985).

We note the parallel provisions of articles 1432c and 1432d because the legislative histories of the two earlier-enacted statutes are relevant to our construction of article 1432e.  See <u>Jessen Asso-</u> <u>ciates v. Bullock</u>, supra.  With the exception of the provisions concerning the appointment of board members, article 1432e was intended to be virtually identical in language and effect to article 1432d, which in turn was intended to mirror article 1432c with minor changes. See Testimony of Mr. Russell S. Rau on Tex. S. B. No. 750 before House Comm. on Urban Affairs, 68th Leg., public hearing (May 8, 1985) (tape recording available from House Staff Services); Testimony of Sen. Hugh Parmer on Tex. S.B. No. 17 before Senate Comm. on Intergovernmental Affairs, 68th Leg., 2nd C.S., public hearing (June 25, 1984) (tape recording available from Senate Reproduction).

Testifying before the committees of the Senate and House of Representatives which considered the legislation which eventually became article 1432c, the sponsors of the legislation and representatives of telephone service suppliers said that the emergency service fee percentage rate adopted by the board of managers would be imposed equally on all subscribers of telephone services in the district. Testimony of Sen. Chet Brooks and Mr. Clark B. Payne on Tex. S. B. No. 606 before Senate Comm. on Intergovernmental Affairs, 68th Leg., public hearing (March 17, 1983) (tape recording available from Senate Reproduction); Testimony of Rep. Gene Green and Mr. Ken Queureaux on Tex. S. B. No. 606 before House Comm. on Urban Affairs, 68th Leg., public hearing (April 19, 1983) (tape recording available from House Staff Services).

The parallel provisions of articles 1432c and 1432d (as amended in 1985) also reveal the erroneous transcription of the phrase "per service year" in section 11(b) of article 1432e. Section 11(b) should read "per service user." See Patterson v. City of Dallas, 355 S.W.2d 838 (Tex. Civ. App. - Dallas 1961, writ ref'd n.r.e.), appeal dism'd, 372 U.S. 251 (1963) (words or phrases in a statute may be supplied, omitted, or transposed in order to arrive at legislative intent); Rogers v. Dallas Railway and Terminal Co., 214 S.W.2d 160 (Tex. Civ. App. - Dallas 1948), aff'd, 218 S.W.2d 456 (Tex. 1949) (same). See also Chambers v. State, 25 Tex. 307 (1860) (phrase in statutory provision substituted to carry out legislative intent); Davis v. State, 225 S.W. 532 (Tex. Crim. App. 1920) (words may be disregarded or eliminated to give effect to legislative intent). The definition of "service user" in all three statutes is "any person or entity who is provided local exchange access lines/trunks in the district." V.T.C.S. arts. 1432c, §3(17); 1432d, §3(17); 1432e, §3(17). The distinction between persons and entities in the definition of "service user" would be meaningless if the legislature intended the base rates for all telephone subscribers to be the same. Section 11(b) of article 1432e, then, mandates that the emergency service fee percentage rate be applied uniformly to all service users, individuals and entities alike. It requires the emergency service fee to be charged and collected on an individual basis according to the base rate charged to each customer.

It is also clear that the legislature did not intend the emergency service fee to be a fixed dollar amount for all service users. Section 14(a) states that the "9-1-1 emergency service fee may be imposed only on the base rate charges or their equivalent," and "may not be imposed on more than 100 local exchange access lines/trunks or their equivalent per entity per location." V.T.C.S. art. 1432e, §14(a). Thus, the sum owed by multiple-line customers to the district for the emergency service fee is dependent upon the number of access lines or trunks the customer receives, up to 100 access lines or trunks.

Accordingly, we conclude that article 1432e, section 11(b), authorizes the board of managers of an emergency communication district to impose a 9-1-1 emergency service fee of up to three percent of the base rate charged to each customer of the principal service supplier, even where the principal service supplier charges different base rates to customers of different participating jurisdictions of the district for the same level of service or where different base rates are charged to single-party and multiple-party customers. The percentage rate adopted by the board from which the emergency service fee is calculated must be uniformly applied throughout the district, regardless of the base rate charged by the service supplier.

Rephrased, your third question is whether 9-1-1 emergency service may be denied to a telephone service customer in the district when providing such service is deemed too costly or burdensome to the district and the customer is not charged the monthly emergency service fee. In view of the terms and purpose of article 1432e, we believe the answer to this question is "no."

Section 8(a) of article 1432e decrees that the emergency communication district "shall provide 9-1-1 service to all participating jurisdictions. . . ." Participating jurisdictions are "those public agencies that vote to be a part of a district." V.T.C.S. art. 1432e, §3(3). A public agency is "any city or county that provides or has authority to provide fire-fighting, law enforcement, ambulance, medical, or other emergency services." Id. §3(2). The term "9-1-1 service" is defined as a "telecommunications service that will allow a user of the public telephone system to reach a public safety answering point by dialing the digits 9-1-1." Id. §3(1) (emphasis added).

The purpose of article 1432e is provided in section 2 of the act:

> It is the purpose of this Act to establish the number 9-1-1 as the primary emergency telephone number for use by certain local governments in this state and to encourage units of local government and combinations of those units of local government to develop and improve emergency communication procedures and facilities in a manner that will make possible the quick response to any person calling the telephone number 9-1-1 seeking police, fire, medical, rescue, and other emergency services. To this purpose the legislature finds and declares:
>
> (1) it is in the public interest to shorten the time required for a citizen to request and receive emergency aid;

(2) there exist thousands of different emergency telephone numbers throughout the state, and telephone exchange boundaries and central office service areas do not necessarily correspond to public safety and political boundaries;

(3) a dominant part of the state's population is located in rapidly expanding metropolitan areas that generally cross the boundary lines of local jurisdictions and often extend into two or more counties; and

(4) <u>provision of a single, primary three-digit emergency number through which emergency services can be quickly and efficiently obtained</u> would provide a significant contribution to law enforcement and other public safety efforts <u>by making it less difficult to notify public safety personnel quickly</u>. (Emphasis added).

It is clear from both the statement of purpose and the language of article 1432e that 9-1-1 service is intended to be available to any person using any telephone in the district in time of emergency. The availability of 9-1-1 service is not limited to persons or entities that receive local exchange access lines from the principal service supplier or that pay the monthly emergency service fee. It cannot be seriously argued, then, that persons who are not charged the monthly fee may, in the discretion of the board of managers, be excluded from the 9-1-1 service system. <u>See also</u> Testimony on Tex. S. B. No. 606 before Senate Comm. on Intergovernmental Affairs, <u>supra</u> (9-1-1 service will be available to transients and to persons calling from any phone in the district); Testimony on Tex. S. B. No. 606 before House Comm. on Urban Affairs, <u>supra</u>.

In any case, the district may not, under the circumstances, decline to charge the emergency service fee to persons living in the district who receive local exchange access lines from the principal service supplier. The emergency communication district has only that authority which is clearly granted by the legislature. <u>See</u> Attorney General Opinion JM-674 (1987) and authorities cited therein. Section 11(b) of article 1432e states that the emergency service fee must be imposed in all jurisdictions. Section 14(a) states that the fee "shall be added to and shall be stated separately in the billing by the service supplier to the service user." A service user is "any person or entity that is provided local exchange access lines/trunks in the district." V.T.C.S. art. 1432e, §3(17).

Finally, we believe that any attempt to limit the availability of 9-1-1 service in the jurisdictions which voted to become part of the

district would defeat the purpose for establishing an emergency communication district in the first place. The district is intended to be used by persons requiring emergency assistance as a conduit for rapid communication to the participating jurisdictions. It is intended to assist these jurisdictions in providing more efficient and timely emergency services, and to assist in coordinating the services of different emergency service units whose jurisdictions may conflict or overlap. To permit the district to select which persons (or telephones) will be provided access to the 9-1-1 system would invite confusion and disorder, a result which the legislature clearly did not intend. Accordingly, you are advised that the emergency communication district may not deny 9-1-1 emergency service to a person receiving local telephone exchange access lines in the district on the basis of excessive cost or burden to the district.

### S U M M A R Y

Article 1432e, section 11(b), V.T.C.S., authorizes the board of managers of an emergency communication district to impose a 9-1-1 emergency service fee of up to three percent of the base rate charged to each customer of the principal service supplier, even where the principal service supplier charges different base rates to customers of different participating jurisdictions of the district for the same level of service or where different base rates are charged to single-party and multiple-party customers. The percentage rate adopted by the board from which the emergency service fee is calculated must be uniformly applied throughout the district, regardless of the base rate charged by the service supplier.

An emergency communication district may not deny 9-1-1 emergency service to a person receiving local telephone exchange access lines in the district on the basis of excessive cost or burden to the district.

Very truly yours,

JIM MATTOX
Attorney General of Texas

JACK HIGHTOWER
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Rick Gilpin
Assistant Attorney General